Civil Action No. 3:25-CV-1230-K
Civil Action No. 3:25-CV-1552-K
(Consolidated)

# UNITED STATES DISTRICT COURT
# FOR THE NORTHERN DISTRICT OF TEXAS

IN RE: ZIPS CAR WASH, LLC, REORGANIZED DEBTORS,

   Debtor.

BVLY PARTNERS CLTZ TYVOLA, LLC and
BVLY PARTNERS CLTZ WILKINSON, LLC,

   Appellants,

 v.

ZIPS CAR WASH, LLC,

   Appellee.

On Appeal from the United States Bankruptcy Court for the Northern
District of Texas, No. 25-80069, Hon. Michelle V. Larson Presiding

# APPELLANTS' BRIEF

Meagan Martin Powers
State Bar No. 24050997
**Martin Powers & Counsel, PLLC**
1431 Greenway Drive, Suite 950
Irving, Texas 75038
Telephone: (214) 612-6474
Direct Line: (214) 612-6471
Facsimile: (214) 247-1155
meagan@martinpowers.com

Andrew W.J. Tarr
Patrick H. Hill (*pro hac vice*)
**Robinson, Bradshaw &
Hinson, P.A.**
600 South Tryon Street, Suite 2300
Charlotte, NC 28202
Telephone: (704) 377-2536
atarr@robinsonbradshaw.com
phill@robinsonbradshaw.com

*Counsel for Appellants BVLY Partners CLTZ Tyvola, LLC and
BVLY Partners CLTZ Wilkinson, LLC*

## DISCLOSURE STATEMENT

Pursuant to Rules 8012(a) and 8014(a) of the Federal Rules of Bankruptcy Procedure, Appellants state that (1) BVLY Partners CLTZ, LLC is the parent company and 100% owner of both BVLY Partners CLTZ Tyvola, LLC and BVLY Partners CLTZ Wilkinson, LLC; and (2) there is no publicly held corporation that holds 10% or more of the stock of BVLY Partners CLTZ Tyvola, LLC or BVLY Partners CLTZ Wilkinson, LLC.

## TABLE OF CONTENTS

**Page**

TABLE OF AUTHORITIES ......................................................................iii

STATEMENT REGARDING ORAL ARGUMENT ...............................vi

JURISDICTIONAL STATEMENT ....................................................... 1

ISSUES PRESENTED ........................................................................ 3

STANDARD OF REVIEW .................................................................. 5

STATEMENT OF THE CASE .............................................................. 6

    A.    The Leases provide an immediate right of termination following an Event of Default for failure to pay Base Monthly Rent.................................. 6

    B.    The Leases allow notice of termination to be delivered by email. ........................................................ 8

    C.    Landlords terminated the Leases, in compliance with the notice provision, following the Debtor's Event of Default for failure to pay Base Monthly Rent. ......................................................................... 10

    D.    The Debtor received the termination notices before filing its bankruptcy petition. .......................... 11

    E.    After termination of the Leases and the Debtor's invalid attempt to cure, the Debtor filed a chapter 11 bankruptcy petition................................................. 13

    F.    The timeline regarding termination is undisputed................................................................. 14

    G.    Procedural history and the Bankruptcy Court's rulings. ...................................................................... 16

        1.    The Stay Relief Order. .................................. 17

        2.    The Lease Assumption Order. ........................... 21

SUMMARY OF ARGUMENT ............................................................ 23

ARGUMENT ................................................................................... 26

# TABLE OF CONTENTS
(continued)

Page

I.   Lease assumption is foreclosed as a matter of law because Landlords terminated the Leases pre-petition......26

    A.   Landlords terminated the Leases before the Petition Time..............................................28

    B.   The Bankruptcy Court erred by concluding that Landlords' email notice was insufficient to terminate the Leases before the Petition Time..........33

    C.   The Bankruptcy Court erred by recognizing a right to cure that does not exist in the Leases...........37

    D.   The Bankruptcy Court erred to the extent it applied the Restatement to delay the effectiveness of Landlords' termination notices........40

    E.   The Bankruptcy Court erred by concluding that it should not fractionalize the date of the petition........44

    F.   The Bankruptcy Court erred to the extent it applied equitable principles to its interpretation of the Leases................................................47

II.  The Debtor did not have an interest in the Leases constituting property of the bankruptcy estate because the Leases were terminated pre-petition...........50

CONCLUSION...........................................................53

CERTIFICATE OF COMPLIANCE.......................................55

CERTIFICATE OF SERVICE...........................................56

# TABLE OF AUTHORITIES

**Page(s)**

## Cases

*Charlotte Housing Auth. v. Fleming,* 123 N.C. App. 511 (1996) ............28

*Crabtree Ave. Inv. Grp., LLC v. Steak and Ale of N.C., Inc.*, 169
    N.C. App. 825 (2005)..............................................................................28

*Duke Energy Corp. v. Malcolm*, 178 N.C. App. 62 (2006)......................32

*Emmanuel African Methodist Episcopal Church v. Reynolds
    Const. Co.*, 217 N.C. App. 176 (2011) .................................. 32, 34, 35, 43

*Gaston Cty. Dyeing Machine Co. v. Northfield Ins. Co.*, 351 N.C.
    293 (2000)..............................................................................................32

*Great Am. Ins. Co. v. C. G. Tate Const. Co.*, 303 N.C. 387 (1981) ..........36

*Hedrick v. Rains,* 344 N.C. 729 (1996)....................................................41

*In re Anne Cara Oil Co.*, 32 B.R. 643 (Bankr. D. Mass. 1983) ...............51

*In re Bourbon Saloon, Inc.*, 647 F. App'x 342 (5th Cir. 2016) ........ 2, 5, 48

*In re Burgos*, 263 B.R. 698 (Bankr. D. Conn. 2001) ...............................46

*In re C.M. Turtur Investments, Inc.*, 93 B.R. 526 (Bankr. S.D.
    Tex. 1988).............................................................................................27

*In re Canada*, 574 B.R. 620 (N.D. Tex. 2017) ...........................................5

*In re Chase Monarch Int'l Inc.*, 581 B.R. 715 (Bankr. D. Puerto
    Rico 2018).............................................................................................50

*In re Donato*, 17 B.R. 708 (Bankr. E.D. Va. 1982).................................46

*In re Estate of Sharpe*, 258 N.C. App. 601 (2018).............................36, 38

*In re Foote*, 277 B.R. 393 (Bankr. E.D. Ark. 2002) ....................27, 41, 51

**TABLE OF AUTHORITIES**

(continued)

Page(s)

*In re Huffman*, 171 B.R. 649 (Bankr. W.D. Mo. 1994) ..................... 26, 27

*In re Johnson*, No. 15-00104-NPO, 2015 WL 1508460 (Bankr. S.D. Miss. Mar. 27, 2015) ................................................... 27

*In re Lakes Region Donuts, LLC*, No. BR 13-11823-BAH, 2014 WL 1281507 (Bankr. D.N.H. Mar. 27, 2014) ................................ 49, 51

*In re Martinez*, 283 B.R. 326 (Bankr. M.D. Fla. 2001) .......................... 46

*In re McLouth*, 268 B.R. 244 (Bankr. D. Mont. 2001) ............................ 46

*In re Mirant Corp.*, 378 F.3d 511 (5th Cir. 2004) .................................. 27

*In re Nat'l Gypsum Co.*, 208 F.3d 498 (5th Cir. 2000) ............................. 5

*In re Neville*, 118 B.R. 14 (Bankr. E.D.N.Y. 1990) ................................ 34

*In re Policy Realty Corp.*, 242 B.R. 121 (Bankr. S.D.N.Y. 1999)28, 32, 33, 51

*In re Southcoast Exp., Inc.*, 337 B.R. 739 (Bankr. D. Mass. 2006).........50

*In re Tate*, No. 21-50947-rbk, 2021 WL 4467604 (Bankr. W.D. Tex. Sept. 29, 2021 ...............................................................49, 53

*In re Trang*, 58 B.R. 183 (Bankr. S.D. Tex. 1985) ............................ 27, 51

*In re Triangle Labs., Inc.*, 663 F.2d 463 (3d Cir. 1981) ................... 49, 53

*Int'l Paper Co. v. Corporex Constructors, Inc.*, 96 N.C. App. 312 (1989)........................................................................... 32, 43

*Lane v. Scarborough*, 284 N.C. 407 (1973) ...................................... 38, 42

*Louisville v. Portsmouth Savings Bank*, 104 U.S. 469 (1881)............... 45

*Main Street Shops, Inc. v. Esquire Collections, Ltd.*, 115 N.C. App. 510 (1994) .............................................................. 29

*Maiorino v. Branford Sav. Bank*, 691 F.2d 89 (2d Cir. 1982) ................ 2

## TABLE OF AUTHORITIES

(continued)

**Page(s)**

*Penn v. Standard Life Ins. Co.*, 160 N.C. 399 (1912)..............................36

*Ritzen Grp., Inc. v. Jackson Masonry, LLC*, 589 U.S. 35 (2020) ..............2

*Robinson v. Chi. Hous. Auth.*, 54 F.3d 316 (7th Cir. 1995) ..............28, 52

*Schokbeton Indus., Inc. v. Schokbeton Products Corp.,* 466 F.2d 171 (5th Cir. 1972) ....................................................................52

*Southpark Mall Ltd. P'ship v. CLT Food Mgmt., Inc.*, 142 N.C. App. 675 (2001) ..........................................................................28

*United States v. Will*, 449 U.S. 200 (1980)...............................................45

*Walton v. City of Raleigh*, 342 N.C. 879 (1996) .......................................28

*Williams v. Habul*, 219 N.C. App. 281 (2012)...................................30, 35

## Statutes

11 U.S.C. § 365(c)(3) ..........................................................................26, 32

11 U.S.C. § 541(b)(2)..................................................................................49

28 U.S.C. § 1334(a) ......................................................................................1

28 U.S.C. § 1334(b)......................................................................................1

28 U.S.C. § 157(b) ........................................................................................1

## Other Authorities

*Restatement (Second) of Property: Landlord and Tenant* § 1.7...... passim

## <u>STATEMENT REGARDING ORAL ARGUMENT</u>

Appellants request oral argument in these consolidated appeals, which present complex questions regarding pre-petition termination of nonresidential real property leases. Appellants respectfully submit that oral argument will significantly aid the decisional process on these important issues.

## JURISDICTIONAL STATEMENT

Appellants challenge the Bankruptcy Court's orders (1) denying their motion for relief from the automatic stay, R. 1325-27 (the "Stay Relief Order"), and (2) allowing Appellee to assume Appellants' nonresidential real property leases with Appellee, R. 10-13 (the "Lease Assumption Order").[1] The Bankruptcy Court had subject-matter jurisdiction to issue the Stay Relief Order and the Lease Assumption Order. Both matters arose in Appellee's case under chapter 11 of the United States Bankruptcy Code. *See* R. 10-13, 14-105, 1325-27. Matters addressing relief from the automatic stay and lease assumption are core proceedings for which the district courts have original jurisdiction. 28 U.S.C. § 157(b); 28 U.S.C. § 1334(a), (b). Pursuant to 28 U.S.C. § 157(a), this Court has referred cases arising in, related to, or under title 11 to the bankruptcy judges for the district. *Order of Reference of Bankruptcy Cases and Proceedings Nunc Pro Tunc* (N.D. Tex. Aug. 3, 1984).

This Court has jurisdiction to review the Bankruptcy Court's Stay Relief Order. Under 28 U.S.C. § 158(a), district courts have jurisdiction to

---

[1] Pursuant to the order consolidating these appeals, ECF No. 11, Appellants cite to the record on appeal prepared for Civil Action No. 3:25-cv-1552-K.

-1-

hear appeals from "final judgments, orders, and decrees" of bankruptcy judges. An order denying relief from the automatic stay is final. *Ritzen Grp., Inc. v. Jackson Masonry, LLC*, 589 U.S. 35, 37-38 (2020).

Similarly, because "orders granting . . . rejection or assumption of unexpired leases . . . have been held sufficiently final to be appealable as of right," the Court has jurisdiction over this appeal from the Lease Assumption Order. *Maiorino v. Branford Sav. Bank*, 691 F.2d 89, 90 (2d Cir. 1982); *see also In re Bourbon Saloon, Inc.*, 647 F. App'x 342, 346 (5th Cir. 2016) (reviewing the district court's affirmance of the bankruptcy court's grant of lease assumption).

The Bankruptcy Court entered the Stay Relief Order on April 28, 2025. R. 1325-27. Appellants filed a notice of appeal regarding the Stay Relief Order on May 12, 2025. R. 1328-31. The Bankruptcy Court entered the Lease Assumption Order on June 6, 2025, R. 10-13, and Appellants filed a notice of appeal regarding that order on June 12, 2025, R. 1-4. Thus, both notices of appeal were timely filed within fourteen days after entry of the relevant orders, as required by Bankruptcy Rule 8002(a)(1). The Court consolidated these appeals—Civil Action No. 3:25-CV-1230-K and Civil Action No. 3:25-CV-1552-K—on June 30, 2025. *See* ECF No. 11.

## ISSUES PRESENTED

I.   Whether the Bankruptcy Court erred in finding that Appellants'
     nonresidential real property leases with Appellee were not
     terminated before Appellee filed its chapter 11 bankruptcy petition.

    a.   Whether the Bankruptcy Court erred in denying Appellants'
     Motion for Relief from the Automatic Stay to Remove the
     Debtor from Leased Premises, R. 106-121.[2]

    b.   Whether the Bankruptcy Court erred in finding, as the basis
     for its decision denying relief from the automatic stay, that
     the leases were not terminated before Appellee filed its
     chapter 11 bankruptcy petition.

---

[2] Appellants appealed both the Stay Relief Order and the Lease
Assumption Order because both rulings addressed whether Appellants'
nonresidential real property leases with Appellee were validly
terminated pre-petition, which is dispositive for purposes of determining
whether the leases can be assumed under 11 U.S.C. § 365. Because the
Bankruptcy Court has now confirmed Appellee's chapter 11 plan, R.
5230-5370, and the chapter 11 plan has become effective, R. 5971-73, this
Court may not need to determine whether relief from the automatic stay
should have been granted. To be clear, Appellants seek a ruling in this
appeal that the leases were terminated pre-petition and thus cannot be
assumed.

      c.     Whether the Bankruptcy Court erred in overruling Appellants' Objection to Notice of Assumption of Certain Leases, R. 989-91.

      d.     Whether the Bankruptcy Court erred in finding, as the basis for its decision allowing Appellee to assume the leases, that the leases were not terminated before Appellee filed its chapter 11 bankruptcy petition.

II.   Whether the Bankruptcy Court erred by holding that Appellants' nonresidential real property leases with Appellee were property of the bankruptcy estate.

      e.     Whether the Bankruptcy Court erred in finding, as the basis for its decision denying relief from the automatic stay, that Appellee had an interest in the leases constituting property of the estate on the ground that 11 U.S.C. § 541(b)(2) was not applicable because the leases had not terminated at the expiration of their stated term before the commencement of Appellee's chapter 11 case.

      f.     Whether the Bankruptcy Court erred in finding, as the basis for its decision allowing Appellee to assume the leases, that

Appellee had an interest in the leases constituting property of the estate on the ground that 11 U.S.C. § 541(b)(2) was not applicable because the leases had not terminated at the expiration of their stated term before the commencement of Appellee's chapter 11 case.

## STANDARD OF REVIEW

On review of a bankruptcy court order, this Court reviews findings of fact for clear error, and it reviews conclusions of law and mixed questions of fact and law *de novo. In re Nat'l Gypsum Co.*, 208 F.3d 498, 504 (5th Cir. 2000). Here, the facts are not in dispute. The question for this Court is about contract interpretation: whether Appellants validly terminated leases prior to the time Appellee filed its bankruptcy petition. *See Bourbon Saloon*, 647 F. App'x at 346 ("[M]atters of contract interpretation are issues of law, which this court reviews *de novo*."). In addition, whether the leases at issue are property of the bankruptcy estate under 11 U.S.C. § 541(b)(2) turns on the proper interpretation of that statute. *See In re Canada*, 574 B.R. 620, 628 (N.D. Tex. 2017) ("[T]his is a matter of statutory interpretation, which this Court reviews *de novo*.").

## <u>STATEMENT OF THE CASE</u>

Appellants BVLY Partners CLTZ Tyvola, LLC and BVLY Partners CLTZ Wilkinson, LLC (together, "Landlords") are owners of two real estate parcels used to operate car washes in Charlotte, North Carolina: one located at 1036 Tyvola Road, and the other at 3401 Wilkinson Boulevard (together, the "Premises"). R. 128-29, ¶¶ 2-5. Appellee Zips Car Wash, LLC (the "Debtor") took possession of the Premises pursuant to two separate lease agreements between each Landlord and the Debtor (collectively, the "Leases"). R. 129, ¶¶ 4-5; R. 133-96 (Tyvola Lease); R. 202-65 (Wilkinson Lease); *see* R. 197-201 (assignment of Tyvola Lease); R. 266-70 (assignment of Wilkinson lease). As detailed below, however, Landlords terminated the Leases before the Debtor filed its chapter 11 petition in this case.

**A.      The Leases provide an immediate right of termination following an Event of Default for failure to pay Base Monthly Rent.**

The Leases are, for all relevant purposes, the same. They involve different properties, different landlord entities, and different rental rates, but the provisions regarding payment of rent, default, termination, and notice are identical. *Compare* R. 139-41, 157-62 & 162-63 *with* R. 208-10,

226-31 & 231-32 (Leases §§ 4, 15 & 18). Under the Leases, the Debtor was required to pay Base Monthly Rent no later than February 1, 2025.[3] R. 139-40, 208-09 (Leases § 4.2). But as of mid-day on February 5, 2025, the Debtor had not paid Base Monthly Rent for either property. R. 130, ¶ 8.

The Leases provide that "[f]ailure by Tenant to pay Base Monthly Rent when due" is an "Event of Default." R. 157, 226 (Leases § 15.1.1). The Leases also provide that, if the Debtor fails to pay Base Monthly Rent when due, Landlords immediately may terminate the Leases "by giving written notice of termination to Tenant." R. 157-58, 226-27 (Leases §§ 15.1.1 & 15.2.1). If Landlords terminate by giving written notice, "Tenant *immediately* shall surrender the Premises." R. 158, 227 (Leases § 15.2.1) (emphasis added). If the Debtor fails to immediately surrender, Landlords may re-enter and take possession of the Premises. R. 158, 227 (Leases § 15.2.1).

---

[3] The Leases state that Base Monthly rent is due "on or before the first day of each calendar month," unless the first day of the calendar month falls on a weekend or a holiday, in which case Base Monthly Rent is due "on the last business day of the immediately preceding calendar month." R. 139-40, 208-09 (Leases § 4.2). Because February 1, 2025 fell on a Saturday, Base Monthly Rent for February 2025 was due Friday, January 31, 2025. For purposes of the present dispute, however, this distinction is not material.

Although the Leases expressly provide the Debtor specific time periods to cure certain types of defaults under the Leases (including failure to pay "Additional Rent,"[4] to deliver insurance documentation, and to comply with other general provisions of the Leases), the Leases afford the Debtor no right to cure a default for failing to timely pay Base Monthly Rent. R. 157, 226 (Leases §§ 15.1.1-15.1.4). Thus, the failure to timely pay Base Monthly Rent is an automatic and immediate Event of Default. R. 157, 226 (Leases § 15.1.1).

### B.    The Leases allow notice of termination to be delivered by email.

After an Event of Default occurs, Landlords have the immediate right to terminate the Leases "by giving written notice of termination to [the Debtor]." R. 158, 227 (Leases § 15.2.1). The Leases provide five

---

[4] There are different types of rent due under the Leases. "Base Monthly Rent" is a set amount due at the beginning of each month. R. 139-40, 208-09 (Leases § 4.2). "Additional Rent" is separate from Base Monthly Rent and includes "all costs, charges, obligations, assessments, and expenses" relating to the property, such as property taxes and insurance premiums. R. 139, 141, 151, 208, 210, 220 (Leases §§ 4.1, 7.1 & 11.6). Failure to timely pay Base Monthly Rent results in a late charge, which is payable as part of Additional Monthly Rent, but the late charge is in addition to Landlords' right to terminate the Leases following nonpayment of Base Monthly Rent. *See* R. 157, 158, 161, 226, 227, 230 (Leases §§ 15.1.1, 15.2.1 & 15.3).

methods for giving notice to the Debtor: U.S. Certified Mail, overnight or express mail courier, personal delivery, facsimile, and email. R. 162-63, 231-32 (Leases § 18).

If notice is given by email, the email must state in the subject line: "URGENT: NOTICE TO [LANDLORD] [TENANT]." R. 163, 232 (Leases § 18(v)(a)). Email notice is to be followed within one business day by a copy sent by U.S. Certified Mail, overnight or express mail courier, or facsimile. R. 163, 232 (Leases § 18(v)(b)).

The language regarding when notice is effective differs based on the type of notice given. If notice is given by U.S. Certified Mail, overnight or express mail courier, or personal delivery, all of which can be rejected by the recipient, the Leases specify that notice is considered given at the time of delivery, or if delivery is rejected, when delivery was attempted. R. 163, 232 (Leases §§ 18(i), 18(ii) & 18(iii)). With facsimile and email, however, which the recipient cannot reject, the Leases provide that notice "shall be deemed to have been duly given . . . via facsimile transmission" or "by e-mail." R. 163, 232 (Leases § 18(iv), (v)).

In addition, the Leases provide that "actual receipt of written notice by a party designated below shall constitute notice given in accordance

with this Lease on the date received, unless deemed earlier given pursuant to" the other methods specified in the Leases. R. 163, 232 (Leases § 18).

### C. Landlords terminated the Leases, in compliance with the notice provision, following the Debtor's Event of Default for failure to pay Base Monthly Rent.

On February 4, 2025, after the Debtor had failed to pay Base Monthly Rent for both properties by the due date, Landlords' Vice President Sophie Teague emailed Beverly Camacho (the Debtor's Accounting Manager), Katelyn McCreight (the Debtor's Senior Accountant), and Zachary Muehl (the Debtor's Vice President, Real Estate & Development) asking about the past-due payments. R. 881, ⁋ 4; R. 891. The Debtor did not respond to this email. R. 881, ⁋ 4. Ms. Teague also tried to call Mr. Muehl regarding the past-due rent payments that same day, but he did not answer or return the call. R. 881, ⁋ 5.

Having received no response from the Debtor regarding the past-due rent payments, Landlords exercised their rights on February 5, 2025, by giving the Debtor notices terminating both Leases at approximately 12:26 PM CT. R. 130, ⁋⁋ 9-10; R. 286-96.

-10-

In strict compliance with the Leases, Landlords sent the notices of termination by email to the official notice contacts designated by the Debtor, followed the same day by copies of the notices sent by express mail courier. R. 130, ¶¶ 9-10; R. 163, 232 (Leases § 18) (acceptable methods for delivering notice); R. 271-85 (designating Mr. Zachary Muehl and Mr. Pat Scheiderer as contacts for official notices under the Leases); R. 286-93 (email delivering notices); R. 294-96 (confirmation of express mail deliveries). The notices specified that the Leases were terminated "***effective immediately***" and asked the Debtor to voluntarily surrender the Premises no later than February 19, 2025. R. 288, 291 (emphasis added).

### D.    The Debtor received the termination notices before filing its bankruptcy petition.

The Debtor acknowledged receipt of the notices of termination at approximately 2:57 PM CT on February 5, 2025, when Mr. Muehl responded to the termination email. R. 130-31, ¶ 11; R. 297-99. In his response to the termination notice, Mr. Muehl asked for instructions to make the past-due rent payments.[5] Landlords responded, however, that

---

[5] The Debtor already had instructions to pay rent to Landlords. The Leases required the Debtor to make Base Monthly Rent payments

the Leases were already terminated, and Landlords would only accept rent for the period of the Debtor's holding over in the Premises to wind down operations. R. 130-31, ¶¶ 11-12; R. 297-303.

Despite Landlords' reiteration of the termination of the Leases, the Debtor still sent full rent payments by wire transfer the evening of February 5, 2025. R. 131, ¶ 13. Around the same time, the Debtor's counsel sent a letter to Landlords asserting, "Landlord did not provide proper notice of demand pursuant to N.C. Gen. Stat. § 42-3 and ***Tenant has cured the default*** within the timeframe prescribed therein." R. 131, ¶ 14; R. 304-07 (emphasis added). However, as Landlords explained in a responsive letter on February 7, 2025, the Debtor's argument ignored long-standing and clear case law holding that § 42-3 has no application where, as here, a lease expressly gives a landlord the right to terminate the lease upon non-payment of rent and reserves the landlord's right of re-entry. R. 308-10. The Debtor has since abandoned its argument that N.C. Gen. Stat. § 42-3 has any application to this matter, but it cannot be

---

pursuant to the Landlord's wire instructions or ACH, which the Debtor had done in the past. R. 141, 210 (Leases § 4.4); R. 383, ¶ 5 (noting that Zips made previous rent payments to Landlord).

disputed that the Debtor's late payment of Base Monthly Rent was an attempt to "cure" its default.

### E. After termination of the Leases and the Debtor's invalid attempt to cure, the Debtor filed a chapter 11 bankruptcy petition.

After acknowledging receipt of the termination notices and receiving additional confirmation of termination by email, the Debtor filed a voluntary petition for relief under chapter 11 of the Bankruptcy Code at approximately 6:32 PM CT on February 5, 2025 (the "Petition Time"). R. 17; R. 1011, ¶ 22. The Debtor continued to operate its business as a debtor in possession, including at the Premises. R. 1012, ¶ 30; *see* R. 10-13.

On February 7, 2025, Landlords' counsel sent a letter to the Debtor's counsel, which, among other things, requested instructions to return the past-due rent payments that the Debtor had wired (without Landlords' consent). R. 131-32, ¶ 16; R. 308-11. The Debtor has never provided instructions for return of those late payments.

The Debtor's counsel wrote another letter to Landlords' counsel on February 13, 2025, arguing again (albeit on different grounds) that the Leases were not terminated prior to the Petition Time. R. 132, ¶ 17; R.

-13-

312-14. This time, the Debtor argued that, under § 1.7 of the *Restatement (Second) of Property: Landlord and Tenant* (the "*Restatement*"), Landlords' notices of termination did not take effect until one minute before midnight on the day Landlords served the notices. R. 312-14.

### F.    The timeline regarding termination is undisputed.

In summary, and as stipulated by the parties, the undisputed timeline of events material to this Court's decision is:

- On February 1, 2025, Base Monthly Rent was due under both Leases.[6]

- On February 4, 2025, Landlords emailed and called the Debtor to inquire about February Base Monthly Rent payments, which the Debtor had not yet paid.

- As of mid-day on February 5, 2025, the Debtor still had not paid Base Monthly rent due under either Lease.

- At approximately 12:26 PM CT on February 5, 2025, Landlords emailed two letters stating that Landlords were terminating both Leases "effective immediately."

---

[6] As noted above, Base Monthly Rent for February 2025 was due on January 31, 2025, but this distinction does not affect the outcome of the present dispute. *See supra* n. 3.

- At approximately 2:57 PM CT on February 5, 2025, the Debtor acknowledged receipt of the email sending notice of termination by requesting instructions to pay the past-due Base Monthly Rent.

- At approximately 4:05 PM CT on February 5, 2025, Landlords responded that they would not accept the rent payments and reiterated that the Leases were terminated with the notices sent earlier that day.

- The evening of February 5, 2025, the Debtor wired the Base Monthly Rent payments to Landlords.

- At approximately 5:16 PM CT on February 5, 2025, the Debtor's counsel sent correspondence to Landlords arguing the terminations were ineffective and that the Debtor had cured the payment default.

- At approximately 6:32 PM CT on February 5, 2025, the Debtor filed its chapter 11 petition.

- On February 6, 2025, the Debtor received by FedEx Priority Overnight delivery hard copies of Landlords' notices terminating the Leases.

- On February 7, 2025, Landlords' counsel wrote to the Debtor's counsel rejecting the rent payments and requesting payment instructions to return the rent payments.

R. 1005-13 (joint stipulation of facts regarding Landlords' motion for relief from the automatic stay).

### G. Procedural history and the Bankruptcy Court's rulings.

On February 27, 2025, Landlords moved for relief from the automatic stay to remove the Debtor from the Premises. R. 106-20. The Debtor objected to Landlords' motion for stay relief on March 26, 2025, R. 362-80, and Landlords filed a reply on April 18, 2025, R. 867-80.

On April 4, 2025, while the motion for stay relief was still pending, the Debtor filed a notice of its intent to assume the Leases pursuant to 11 U.S.C. § 365. R. 393, 635-66. Landlords objected to the Debtor's notice of lease assumption on April 18, 2025. R. 989-91.

The parties appeared before the Bankruptcy Court on April 23, 2025 for a hearing on Landlords' motion for relief from the automatic stay. R. 390-91, 1324, 1375-1445.

### 1.    The Stay Relief Order.

The Bankruptcy Court ruled from the bench at the April 23, 2025 hearing, noting at the outset that it was only resolving Landlords' motion for relief from the automatic stay and would rule on the issue of lease assumption at a later date. R. 1432. This bench ruling included several findings that are central to this appeal.

First, the Bankruptcy Court found that it was unclear whether email notice alone is sufficient to terminate the Leases:

- "I believe that both parties have given me logical readings of what [section] 18(v) could mean. . . . I don't see anything in [section] 18(v) that tells me that the Debtors' reading of the two prongs of notice is [] an illogical one." R. 1440-41.

- "[F]rom a notice standpoint, accepting something by email, it's not as definitive a type of notice as something that comes by mail, by FedEx, by certified mail. Email may not be received for a number of reasons." R. 1441.

- "[I]f you decide to serve your notice by email, you must follow up that email within one business day by a hard-copy delivery. So I think there is at least an argument by the Debtor under this lease as to whether or not both things were required." R. 1441.

- "[T]he Court finds that [section] 18(v) is at least equivocal as to whether there has been a proper and complete termination." R. 1441.

Second, the Bankruptcy Court found that it is unclear whether the Leases provide the Debtor a right to cure for failure to timely pay Base Monthly Rent:

- "[T]here is no specific cure time period that is stated in [section] 15.1.1, nor is there an absolute prohibition on cure stated in this section." R. 1438.

- "Section 15.3 seems to intimate at least a contractual consequence of what happens if you don't pay your rent. That there will be a late fee charged and that section determines what the late fee is, what the percentage is. And then [section] 15.1.2 comes right behind that and says that failure of the tenant to pay additional rent is also a default and if the failure continues for 10 days after written notice then the Landlord can effect remedies, as well. Again, the lease does seem to fill in what happens if you don't pay your rent, you are assessed a late fee and failure to pay it is additional rent." R. 1438-39.

- "Then when you go to [section] 15.2, it says the Landlord shall have one or more of the following remedies after the occurrence of an uncured default by tenant. Again, uncured is non-defined there and somewhat vague." R. 1439.

Third, the Bankruptcy Court found that it would not be unreasonable to read § 1.7 of the *Restatement* into the Leases, which would have the effect of giving the Debtor a right to cure:

- "I accept [Landlords'] explanation that certainly there are different cure provision[s], so they don't want to say what provision it was cured under, but the lease is not specific either. That's where the [Debtor's] argument with respect to the Restatement [section 1.7] comes in." R. 1439.

-18-

- "The Restatement certainly is not dispositive of the reading of this lease under North Carolina law, but nor is it illogical, arbitrary, or unreasonable that there should be some understood opportunity to cure, some reasonable time. And North Carolina courts have accepted the Restatement as persuasive authority." R. 1439.

Fourth, the Bankruptcy Court determined that, under the circumstances, it would not be appropriate to fractionalize the date of the Debtor's bankruptcy petition:

- "[T]he relief sought would require the Court to essentially fractionalize the petition date. The Supreme Court has stated for a number of years there's a common law rule that individual days should not be fractionalized, and I'm citing to you there from <u>United States v. Will</u>, 449 U.S. 200, also from <u>Louisville v. Portsmouth Savings Bank</u>, 104 U.S. 469." R. 1442.

- "The courts frown upon the fractioning of days, but I recognize that bankruptcy requires us to do that. . . . I don't think that we have that set of facts here. We certainly have a legitimate dispute. . . . But I don't believe at the end of the day, as a court of equity considering 362(d)(1) and the burdens that are imposed, that I can do that upon these facts and this particular reading of the lease." R. 1442-43.

Fifth, the Bankruptcy Court found that the equities favor the Debtor:

- "[W]hen it comes to lifting the stay, the Court is guided by 362(d)(1) [of the Bankruptcy Code], a court shall only grant relief from the automatic stay for cause. . . . Cases typically rely on a mixture of different factors." R. 1436-37.

-19-

- "Landlord's interpretation of the lease is not an illogical one, it's not unsupported, but it is drastic, and it is [a] very conservative reading of the lease itself. We're talking about a singular email notice within hours before a filing. But if I were to take the Landlord's reading of the lease terms as it's been interpreted, I could determine that if a rent payment was late by minutes, on February 2nd, this Landlord at 12:01 a.m. could have wholly and irretrievably terminated this lease and caused the tenant to vacate by an email. By email sent at 12:01 in the middle of the night on February 2nd. Again, I find that to be a very restrictive reading of a lease." R. 1437-38.

- "In this case, the cure, the attempted cure, whatever you want to call it, full payment of the rent came within hours. Also, when you look at [section] 15.2.1, it recognizes that the Landlords' rights will be determined by law or in equity." R. 1439-40.

- "We don't have a termination pursuant to the stated terms of the lease, and these obviously are valuable assets of the estate. To determine that this lease could have been terminated on these terms by a mere email is a harsh result." R. 1442.

- "Where, as here, the Landlords purported to terminate two leases which were valuable to the Debtors, by email, mere hours before a bankruptcy [filing], and in fact received the full curative rent payments before such filing, the balance of the equities favor the Debtor." R. 1443.

Finally, the Bankruptcy Court determined that section 541(b)(2) of the Bankruptcy Code does not apply, and thus that the Leases are property of the bankruptcy estate:

- "We discussed a lot of provisions, but those that I, in my estimation, do not find applicable are specifically 362(b)(10) and 541(b)(2)." R. 1433.

- "[Section] 541(b) provides that the interest of the Debtor under such lease does not become property of the estate if the stated term expired before the commencement of the case and ceases to be property of the estate upon expiration of the stated term after the commencement." R. 1433.

- "[T]he exception [in §§ 362(b)(10) and 541(b)(2)] is limited to leases where the stated term has expired, not to leases terminated for other reasons, which would be the situation in this case." R. 1434.

On April 28, 2025, the Bankruptcy Court issued its written Stay Relief Order, which fully incorporated its April 23 bench ruling by reference. R. 1325-27. Landlords timely appealed the Stay Relief Order on May 12, 2025. R. 1328-30.

## 2. The Lease Assumption Order.

On June 3, 2025, the parties appeared before the Bankruptcy Court again for a status conference addressing the issue of Lease Assumption. R. 1336-37. As the parties explained during the status conference, Landlords objected to assumption of the Leases on the same grounds they asserted in their stay relief motion—that the Leases were terminated pre-petition and thus cannot be assumed—which the Bankruptcy Court already considered during the April 23, 2025 hearing. R. 1448; *see* R. 989-

91. In lieu of presenting the same arguments again, the parties proposed that each of them would submit a proposed order, with the Debtor's proposed order allowing assumption of the Leases, and Landlords' proposed order disallowing assumption of the Leases. R. 1448. The Bankruptcy Court accepted this proposal, after which the parties submitted their competing proposed orders. R. 1339-73.

On June 6, 2025, the Bankruptcy Court issued its written Lease Assumption Order, adopting the Debtor's proposed order, which overruled Landlords' objection and allowed the Debtor to assume the Leases. R. 10-13. The Bankruptcy Court again incorporated by reference its bench ruling from the April 23, 2025 hearing on stay relief and concluded that: (1) the Leases are property of the bankruptcy estate; (2) 11 U.S.C. § 365(c)(3), which provides that the Debtor may not assume a nonresidential real property lease that was terminated prior to the bankruptcy petition, did not apply; and (3) the Debtor can assume the Leases pursuant to 11 U.S.C. § 365. R. 10-13.

Landlords timely appealed the Bankruptcy Court's Lease Assumption Order on June 12, 2025. R. 1-4.

## SUMMARY OF ARGUMENT

The Debtor's failure to timely pay Base Monthly Rent was an immediate Event of Default that the Debtor had no right to cure. As the Leases gave them the right to do, Landlords gave the Debtor notice of termination of the Leases based on the Debtor's Event of Default before the Debtor filed its bankruptcy petition. Landlords' termination notices complied in all respects with the requirements of the Leases. R. 162-63, 231-32 (Leases § 18). Because the Leases were validly terminated before the Petition Time, the Leases were not property of the Debtor's bankruptcy estate under 11 U.S.C. § 541(b)(2), the automatic stay did not prohibit Landlords from obtaining possession of the Premises under 11 U.S.C. § 362(b)(10), and the Debtor could not assume the Leases under 11 U.S.C. § 365(c)(3). Thus, the Bankruptcy Court's Stay Relief Order and Lease Assumption Order should be reversed.

First, the Bankruptcy Court incorrectly concluded that the notice of termination was not effective when Landlords sent it by email at 12:26 PM CT on February 5, 2025. The Leases expressly provide that email is a satisfactory form of notice. Further, the requirement that Landlords follow email notice with a copy by certified mail, overnight mail, or

facsimile does not delay the time notice is given until the time the copy arrives at the Debtor's address. If notice-by-email were effective only at the time a copy was given by the other methods identified in the Leases, Landlords' right to give notice by email would be rendered meaningless. The only reasonable interpretation, and the one that gives meaning to all provisions of the Leases as required, is that notice of termination is effective at the time Landlords sent the email, so long as Landlords timely provide a hard copy, too.

Second, the Bankruptcy Court's conclusion that notice of termination by email was not effective when Landlords sent it creates a contradiction in the terms of the Leases. Namely, if notice of termination by email is not immediately effective, the Debtor would be afforded a cure right for the failure to pay Base Monthly Rent on time, a right expressly omitted from the Leases. To overcome this contradiction, the Bankruptcy Court constructed a new and atextual right for the Debtor to cure an Event of Default for failure to timely pay Base Monthly Rent, incorrectly assuming that cure right should exist notwithstanding the plain language of the Leases. The Bankruptcy Court's reading of the Leases to

cause contradictions among the terms and to create new rights for the Debtor also was incorrect.

Third, the Bankruptcy Court erred to the extent it applied the *Restatement* § 1.7(f), which is not determinative of North Carolina law (which governs the Leases) and has only been cited in one other case throughout the country. Moreover, there is no dispute that the Debtor actually received the termination notices before the Petition Time, and the *Restatement* should not be used to delay termination inconsistent with the terms of the Leases.

Fourth, the Bankruptcy Court erred by concluding that it would be inappropriate to fractionalize the date of the Debtor's bankruptcy petition. Well established case law—including the Supreme Court cases the Bankruptcy Court cited—supports fractionalizing days to determine whether certain events occurred before the bankruptcy petition.

Fifth, the Bankruptcy Court erred to the extent it applied equitable principles to the purely legal question of contract interpretation. Although equitable principles may guide the determination whether there is cause to lift the automatic stay, whether Landlords validly

terminated the Leases pre-petition was a threshold, legal question that turns on the plain language of the Leases.

Finally, the Bankruptcy Court erred by adopting the position that 11 U.S.C. § 541(b)(2) "is limited to leases where the stated term has expired, not to leases terminated for other reasons." R. 1434. In addition to being inconsistent with the parties' arguments, the Bankruptcy Court's construction of § 541(b)(2) cannot be squared with the text and purpose of the statute.

## ARGUMENT

### I.    Lease assumption is foreclosed as a matter of law because Landlords terminated the Leases pre-petition.

Before a debtor may exercise the lease-assumption power enumerated in 11 U.S.C. § 365(a), it must be established that an executory contract or unexpired lease existed at the time of the filing of the bankruptcy petition. *In re Huffman*, 171 B.R. 649, 653 (Bankr. W.D. Mo. 1994).

Here, the Debtor cannot assume the Leases under § 365, which provides that a lease may not be assumed if "such lease is of nonresidential real property and has been terminated under applicable nonbankruptcy law prior to the order for relief." 11 U.S.C. § 365(c)(3); *see*

-26-

*In re Foote*, 277 B.R. 393, 396 (Bankr. E.D. Ark. 2002) ("If the contract or lease has expired by its own terms or has been terminated prior to the commencement of the bankruptcy case, then there is nothing left for the [debtor] to assume or [reject].") (quoting *In re Huffman*, 171 B.R. at 653); *In re Trang*, 58 B.R. 183, 189 (Bankr. S.D. Tex. 1985) ("It is well settled law that the debtor cannot assume leases that do not exist."); *In re Johnson*, No. 15-00104-NPO, 2015 WL 1508460, at *6 (Bankr. S.D. Miss. Mar. 27, 2015) ("If, however, the lease has been terminated prior to the commencement of the bankruptcy case, there is nothing left for the debtor to assume.").

More fundamentally, the Leases are not subject to assumption under § 365 because "a terminated contract can in no way be executory." *In re C.M. Turtur Investments, Inc.*, 93 B.R. 526, 535 (Bankr. S.D. Tex. 1988); *see In re Mirant Corp.*, 378 F.3d 511, 518 n.3 (5th Cir. 2004) ("executory" means a contract for which some performance is due on both sides).

Under their plain language, both Leases were terminated prior to the Debtor's filing of its bankruptcy petition. Thus, the Bankruptcy

Court's conclusion that the Leases can be assumed under § 365 should be reversed.

## A.    Landlords terminated the Leases before the Petition Time.

Whether a lease terminated before commencement of the bankruptcy case is determined by state law. *Robinson v. Chi. Hous. Auth.*, 54 F.3d 316, 320 (7th Cir. 1995); *In re Policy Realty Corp.*, 242 B.R. 121, 128 (Bankr. S.D.N.Y. 1999). These Leases are governed by the law of North Carolina. R. 171, 240 (Leases § 26.9).

Under North Carolina law, courts must construe contracts according to their plain language, which conclusively demonstrates the intent of the contracting parties. *Walton v. City of Raleigh*, 342 N.C. 879, 881 (1996); *see also Southpark Mall Ltd. P'ship v. CLT Food Mgmt., Inc.*, 142 N.C. App. 675, 678 (2001) ("[A] word in a lease 'should be given its natural and ordinary meaning.'") (quoting *Charlotte Housing Auth. v. Fleming,* 123 N.C. App. 511, 514 (1996)). Termination of a lease is effective as long as the party seeking termination complies with the requirements of the lease regarding notice of termination. *See Crabtree Ave. Inv. Grp., LLC v. Steak and Ale of N.C., Inc.*, 169 N.C. App. 825, 828-29 (2005) (termination was effective based on notice that complied with

-28-

the requirements of the lease); *Main Street Shops, Inc. v. Esquire Collections, Ltd.*, 115 N.C. App. 510, 515 (1994) (applying the terms of the lease to determine when notification of default was properly given).

Here, Landlords fully and finally terminated the Leases before the Petition Time. As detailed above, the Debtor's failure to pay Base Monthly Rent by February 1, 2025 was an immediate Event of Default that the Debtor had no right to cure. Following this Event of Default, the Leases provided Landlords the right to terminate "by giving written notice of termination to Tenant," at which point "Tenant immediately shall surrender the Premises." R. 158, 227 (Leases § 15.2.1). Landlords' delivery of the termination notices complied in all respects with the requirements of the Leases and was "duly given . . . by e-mail" several hours before the Petition Time. R. 162-63, 231-32 (Leases § 18). There is also no question that the Debtor received actual notice of termination in advance of the Petition Time. R. 130-31, ¶ 11; R. 297-99.

The Leases make it clear that a notice of termination is effective as soon as it is given. *See* R. 158, 227 (Leases § 15.2.1) (all that is required to terminate is "giving written notice"); *see also* R. 172, 241 (Leases § 26.12) ("Time is of the essence of every provision of this Lease."). For

notice delivered by mail, courier, or personal delivery, because those methods can be rejected by the recipient, the Leases specify that notice is given—and thus effective—at the time of delivery or, if the recipient rejects delivery, at the time of attempted delivery. R. 162-63, 231-32 (Leases § 18). For notice given by email or facsimile, which cannot be rejected, there is no reason for the Leases to specify when delivery is effective in the case of rejection. The clear implication of the language regarding notice by email is that the notice is effective when it is delivered to the Debtor. *See Williams v. Habul*, 219 N.C. App. 281, 292 (2012) ("[T]he intention of the parties is inferred from the words of the contract."). Read in its proper context, § 18(v) is sufficiently clear regarding when notice by email is effective.

Under the undisputed facts here, there is also no question about when the termination notices were delivered by email. Mr. Muehl responded to the termination notice, demonstrating that the termination notices were delivered, and thus effective, no later than 2:57 PM CT on February 5, 2025. *See* R. 1010, ⁋ 18. It is also undisputed that this occurred several hours before the Petition Time. R. 1011, ⁋ 22.

Relatedly, Mr. Muehl's actual receipt of the termination notices is an alternative and independent ground supporting the conclusion that Landlords terminated the Leases pre-petition. The Leases provide that "actual receipt of written notice by a party [designated to receive notice] shall constitute notice given in accordance with this Lease on the date received, unless deemed earlier given pursuant to the foregoing methods of delivery." R. 162-63, 231-32 (Leases § 18). In other words, if Landlords give notice that the Debtor actually receives, that notice is effective regardless of the method employed. Here, the Debtor does not dispute Mr. Muehl received actual notice of termination before the Petition Time. R. 1010-11.

The fact that the Leases require the Debtor to "immediately" surrender the Premises following Landlords' notice of termination provides further support for the conclusion that Landlords' termination notices were effective immediately upon delivery. R. 158, 227 (Leases § 15.2.1). Although this requirement relates to termination of possession rather than termination of the Leases themselves, the fact that the Leases required "immediate" surrender of the Premises following delivery of a notice of termination shows that the parties intended

-31-

termination to be effective at the exact time notice is given. *See, e.g.,* *Policy Realty*, 242 B.R. at 129 (distinguishing between a legal interest in real property and a merely equitable possessory interest). Any interpretation that treated termination as effective sometime after notice is given would not be harmonious with this requirement—that the Debtor immediately surrender possession following notice of termination. *See Emmanuel African Methodist Episcopal Church v. Reynolds Const. Co.*, 217 N.C. App. 176, 179-80 (2011) (courts must construe the contract "as a whole" and determine intent from "the entire instrument and not from detached portions") (quoting *Int'l Paper Co. v. Corporex Constructors, Inc.*, 96 N.C. App. 312, 316 (1989)); *Duke Energy Corp. v. Malcolm*, 178 N.C. App. 62, 65 (2006) ("The various terms of the [contract] are to be harmoniously construed.") (quoting *Gaston Cty. Dyeing Machine Co. v. Northfield Ins. Co.*, 351 N.C. 293, 299-300 (2000)).

Thus, in compliance with the plain language of the Leases, Landlords' email was effective to terminate the Leases at approximately 12:26 PM CT on February 5—over six hours before Debtor filed its chapter 11 petition at approximately 6:32 PM CT that same day. *See* R. 1010-11. The Debtor thus cannot assume the Leases because they were

"terminated under applicable nonbankruptcy law prior to the order for relief." *See* 11 U.S.C. § 365(c)(3).

### B. The Bankruptcy Court erred by concluding that Landlords' email notice was insufficient to terminate the Leases before the Petition Time.

Landlords strictly followed the notice-by-email provision, which provides that email notice is sufficient to terminate the Leases. *See* R. 163, 232 (Leases § 18(v)) (notice "shall be deemed to have been duly given . . . by e-mail"). Landlords complied with that provision by sending the Debtor an email on February 5 to the official notice contacts delineated in the amended Leases. *See* R. 271-85. As required by § 18(v), Landlords' email included an all-caps subject line: "URGENT: NOTICE TO TENANT OF DEFAULT AND TERMINATION." R. 287. The notices specified that the Leases were terminated "***effective immediately***" and asked the Debtor to voluntarily surrender the Premises no later than February 19, 2025.[7] R. 287, 288, 291 (emphasis added). Landlords further

---

[7] The fact that Landlords gave the Debtor a commercially reasonable time to vacate the Premises does not mean that the Leases were still in effect during that period or that the Debtor had an opportunity to cure. The notices unequivocally terminated the Leases immediately, regardless of any remaining possessory interests the Debtor may have had in the Premises. *See Policy Realty*, 242 B.R. at 129 (debtor's claim of equitable possessory interest was insufficient to trigger

complied with the notice-by-email provision by sending hard copies the same day by express mail courier. R. 130, ¶¶ 9-10; R. 294-96.

The Bankruptcy Court determined that Landlords' email alone was insufficient to give notice of termination before the Petition Time, apparently crediting the Debtor's interpretation that notice was effective only upon delivery of hard copies of the notices the day after delivery by email. R. 1441-42. This interpretation, however, would impose extra steps beyond email notice in a way that would impermissibly negate § 18(v) of the Leases. *See Emmanuel*, 217 N.C. App. at 179-80 (courts must interpret contracts in a way that gives meaning to all provisions and avoids rendering certain clauses superfluous).

The Leases provide, in subsections 18(i), (ii), and (iv), that notice can be duly given by mail, courier, or facsimile. If notice by email were effective only at the time one of those other methods was completed, then there would be no reason for Landlords to give notice by email first, rendering subsection 18(v) meaningless. The only reasonable

---

the automatic stay because adopting that argument "would undermine the purpose of §§ 362(b)(10) and 541(b)(2)"); *In re Neville*, 118 B.R. 14, 18 (Bankr. E.D.N.Y. 1990) ("The Debtor's argument that his equitable possessory interests are protected by the automatic stay is totally without support.").

interpretation, and the one that gives meaning to all provisions of the Leases as required, is that notice of termination is effective at the time the email is sent, so long as Landlords later provide a copy, too.

In its bench ruling, the Bankruptcy Court further observed that "18(v) is at least equivocal as to whether there has been a proper and complete termination." R. 1441. But the intent of the notice-by-email provision is evident from its plain language. *See Williams*, 219 N.C. App. at 292 (requiring courts to infer the parties' intent from the words of the contract). Because of the strict requirements in § 18(v), it is clear that the parties intended to allow for immediate notice of termination by email. The all-caps subject line is designed to capture the recipient's attention right away—which it did. Within mere hours of the email's dispatch, and before the Debtor filed its bankruptcy petition, the Debtor acknowledged receipt. R. 1010-11. Again, if the parties did not intend for the email itself to constitute immediate notice duly given at the time the email is sent, then the attention-grabbing language in the subject line would serve no purpose. *See Emmanuel*, 217 N.C. App. at 179-80.

The Bankruptcy Court also questioned the effectiveness of email notice generally, noting that email is "not as definitive a type of notice as

-35-

something that comes by mail, by FedEx, by certified mail." R. 1441. But the language of the Leases controls, and the parties expressly chose to provide for notice by email. The Bankruptcy Court made no objective findings that allowing formal notice by email is contrary to public policy or prohibited by any law. *Great Am. Ins. Co. v. C. G. Tate Const. Co.*, 303 N.C. 387, 391 (1981) ("Freedom of contract is constitutionally guaranteed and provisions in private contracts, unless contrary to public policy or prohibited by statute, must be enforced as written."). Therefore, the Bankruptcy Court could not modify the terms of the Leases regarding the sufficiency of email notice. *See In re Estate of Sharpe*, 258 N.C. App. 601, 607 (2018) ("Courts are not at liberty to rewrite contracts for the parties. . . . We must, therefore, determine what they meant by what they have said—what their contract is, and not what it should have been.") (quoting *Penn v. Standard Life Ins. Co.*, 160 N.C. 399, 402 (1912)).

In sum, the plain language of the Leases unambiguously shows that the parties intended for email to be a sufficient and immediate method for giving notice of termination. To the extent the Bankruptcy Court found that email alone was insufficient to effectuate notice before the Petition Time, this was error that should be reversed.

**C.    The Bankruptcy Court erred by recognizing a right to cure that does not exist in the Leases.**

As the legal precedent cited above makes clear, a contract must be read as a whole, and terms of the contract must be harmoniously construed. Determining that email notice is not effective immediately upon delivery to the Debtor, however, provided the Debtor a cure right that did not exist under the plain terms of the Leases. Acknowledging this dilemma, the Bankruptcy Court found that the Leases do not ***expressly disallow*** the Debtor to cure an Event of Default for failure to timely pay Base Monthly Rent and, further, that it would not be "unreasonable that there should be some understood opportunity to cure." R. 1438-39, 1441-42. The Bankruptcy Court's interpretation and recognition of a right to cure, however, cannot be reconciled with the language of the Leases.

Failure to pay Base Monthly Rent when due is an automatic Event of Default for which no cure period is listed. R. 157, 226 (Leases § 15.1.1). If the parties had intended to provide a right to cure a default based on nonpayment of Base Monthly Rent, they would have. Indeed, the parties expressly provided a cure right for other types of defaults under the Leases. *See* R. 157, 226 (Leases §§ 15.1.2-15.1.4).

The Leases, however, are silent regarding the right to cure a default for failure to timely pay Base Monthly Rent. And this silence speaks loudly. It is the unmistakable manifestation of the parties' choice not to give the Debtor an opportunity to cure its default for failing to timely pay Base Monthly Rent. It was legal error for the Bankruptcy Court to imply a right to cure—doing so was inconsistent with the express provisions of the Leases. *See Lane v. Scarborough,* 284 N.C. 407, 410-11 (1973).

To the extent the Bankruptcy Court found a right to cure based on the Leases' late-fee provision, that interpretation was incorrect. It is true that the Leases provide for a late fee whenever the Debtor "fails to pay when due any payment of rent or other charges which Tenant is obligated to pay to Landlord" and that this late fee is payable as "Additional Rent." R. 161, 230 (Leases § 15.3). It is also true that the Leases provide a right to cure nonpayment of "Additional Rent." R. 157, 226 (Leases § 15.1.2). But to construe these provisions as providing a cure right for nonpayment of Base Monthly Rent would be to re-write the Leases, which is impermissible under governing rules of contract interpretation. *See, e.g.*, *Sharpe*, 258 N.C. App. at 607.

-38-

The language and structure of the Leases make it clear that the late-fee provision is separate from and does not modify the right to terminate the Leases immediately following nonpayment of Base Monthly Rent. Section 15.3, which provides the right to collect a late fee, is a stand-alone subsection separate from the subsections defining an Event of Default and providing for remedies following an Event of Default. R. 157-61, 226-30. The Leases state that the purpose of the late fee is to "compensate Landlord for accounting and administrative expenses incurred by Landlord" relating to late payments. R. 161, 230. More importantly, the subsection providing the Landlords' remedies following an Event of Default—including termination of the Leases— states that such remedies "are not exclusive" and are "cumulative in addition to any remedies" available to Landlords. R. 158, 227 (Leases § 15.2).

In other words, the late-fee provision is an independent and additional remedy available to Landlords in the event the Debtor fails to timely pay Base Monthly Rent. The fact that Landlords may charge a late fee, and the fact that the late fee is payable as Additional Rent, simply

cannot negate the parties' choice not to provide a right to cure a default for nonpayment of Base Monthly Rent.

Accordingly, the Bankruptcy Court erred by recognizing a right to cure that is unsupported by the language of the Leases in an effort to support its finding that email notice was not immediately effective upon delivery to the Debtor.

### D. The Bankruptcy Court erred to the extent it applied the *Restatement* to delay the effectiveness of Landlords' termination notices.

The Bankruptcy Court also erred to the extent it applied the *Restatement* § 1.7 to recognize a right to cure a default for failure to pay Base Monthly Rent in order to harmonize its conclusion that email notice is not effective immediately upon delivery. In its bench ruling, the Bankruptcy Court noted that the Leases are "not specific" regarding such a cure right, but that the Debtor's request to apply the *Restatement* § 1.7 "comes in" to supply "some understood opportunity to cure." R. 1439. The *Restatement*, however, cannot apply to these Leases.

The *Restatement* § 1.7(f) provides that, if a lease gives one party the option to terminate, the termination occurs at 11:59 PM on the date the other party receives notice that the option has been exercised. The "one

-40-

minute before midnight" rule has not been cited—let alone adopted—by any North Carolina court. Although North Carolina courts have cited other provisions of the *Restatement* as persuasive authority, the North Carolina Supreme Court has made clear that a specific provision of the *Restatement* will not be determinative of North Carolina law unless and until that court specifically adopts it. *Hedrick v. Rains,* 344 N.C. 729, 729 (1996).

The application of the "one minute before midnight rule" does not have significant support from courts outside of North Carolina, either. There is only one case citing that rule from the *Restatement* § 1.7(f). It is not a North Carolina decision, and the court in that case cited the rule only because (i) the lease at issue did not "specify what type of notice is required to terminate the lease" and (ii) there was no state law defining "the exact moment a lease terminates upon default of its terms in the absence of a lease provision dictating when the lease terminates." *In re Foote,* 277 B.R. at 397.

Here, by contrast, the Leases provide five express methods for giving notice of lease termination and specify that the termination is effective at the time notice is given. R. 158, 162-63, 227, 231-32 (Leases

§§ 15.2.1 & 18). As noted above, by clear implication, the Leases provide that notice given by email is effective when sent by that method. *See* Part I.A, *supra*. Thus, there is no reason to resort to the *Restatement*'s gap-filling rules because the Leases already specify when notice is "given," and the language of the Leases themselves is sufficient to dictate the time Landlords completed termination of the Leases.

Moreover, even if there were a gap to fill regarding when notice is given, the *Restatement* § 1.7(f) would not be an appropriate implied term for these Leases. Under governing North Carolina law, a court can recognize an implied term of a contract only if the implied term is consistent with the express provisions of the contract. *Lane*, 284 N.C. at 410-11. Implying the *Restatement* § 1.7(f) as a term of the Leases and treating notice of termination as effective one minute before midnight would—as the Bankruptcy Court expressly contemplated—give the Debtor a right to cure its default for nonpayment of Base Monthly Rent. The Debtor would have until 11:59 PM on the date of notice to make the past-due payment, and thus avoid termination, every time it received a notice of termination for nonpayment of Base Monthly Rent. But implying such a term would be inconsistent with the express terms in

-42-

§ 15.1 of the Leases, wherein the parties provided a right to cure other types of breaches but intentionally omitted the right to cure a default for failure to pay Base Monthly Rent.

Even if there were some genuine dispute about the precise time email notice is "given" under the Leases, it is clear that Landlords effectively terminated the Leases pre-petition for the alternative and independent reason that the Debtor actually received written notice hours before the Petition Time. When Mr. Muehl responded to Landlords' email delivering the notices of termination, he established the Debtor's "actual receipt of written notice," which is effective "on the date received." R. 1010-11; R. 163, 232 (Leases § 18).

Although the Leases provide that actual notice is effective on the "date" received rather than the exact time received, this provision must be construed in context, along with the other provisions of the Leases. *See Emmanuel*, 217 N.C. App. at 179 ("It is well settled that a contract is construed as a whole. The intention of the parties is gleaned from the entire instrument and not from detached portions. Individual clauses are to be considered in context.") (quoting *Int'l Paper*, 96 N.C. App. at 316). And the other provisions—specifically the various subsections within

§ 15.1—make it clear that there is no right to cure an Event of Default for failure to pay Base Monthly Rent. If the Court were to construe § 18 as providing that actual receipt of written notice is effective at one minute before midnight on the date it is received, that construction would directly contravene § 15.1 by granting the Debtor a right to cure nonpayment of Base Monthly Rent between the time it received actual notice of termination and 11:59 PM that same day. The only permissible interpretation is that "actual receipt of written notice" is effective at the specific time of receipt.

Accordingly, Landlords' notices of termination were effective at the time they were delivered or, at the latest, at the time the Debtor acknowledged receiving them, all of which occurred before the Petition Time. To the extent the Bankruptcy Court applied the *Restatement* § 1.7 to delay the effective time of termination, that ruling was incorrect.

### E. The Bankruptcy Court erred by concluding that it should not fractionalize the date of the petition.

The Bankruptcy Court also erred by finding it should not fractionalize the date of the Debtor's bankruptcy petition for purposes of determining whether Landlords terminated the Leases pre-petition.

In its bench ruling, the Bankruptcy Court cited two Supreme Court cases recognizing a "common law rule that individual days should not be fractionalized." R. 1442. In both of those cases, however, the Supreme Court held that it is appropriate to fractionalize days when justice so requires and refused to treat the day at issue as one indivisible unit of time. *See United States v. Will*, 449 U.S. 200, 225 n.29 (1980) (noting that one of the parties invoked the "rule that the law does not recognize fractions of a day" but describing that rule as "purely one of convenience" and noting that, when it is "important to the ends of justice . . . the law will look into fractions of a day, as readily as into the fractions of any other unit of time"); *Louisville v. Portsmouth Savings Bank*, 104 U.S. 469, 475 (1881) ("There is no indivisible unity about a day which forbids us, in legal proceedings, to consider its component hours, any more than about a month, which restrains us from regarding its constituent days. The law is not made of such unreasonable and arbitrary rules.").

The departure from the so-called "unified day rule"—and the ability to fractionalize days—is well documented not only in these Supreme Court cases, but also in more recent bankruptcy-specific cases. Courts routinely hold that an action taken hours before the bankruptcy petition

is effective pre-petition. *See In re McLouth*, 268 B.R. 244, 246-47 (Bankr. D. Mont. 2001) (rejecting a "unified day" theory of the automatic stay and holding that the stay takes effect at the precise time of the petition); *In re Burgos*, 263 B.R. 698, 699 (Bankr. D. Conn. 2001) (eviction judgment signed one hour before filing of the petition was effective because the automatic stay was not yet in effect); *In re Martinez*, 283 B.R. 326, 327 (Bankr. M.D. Fla. 2001) (because repossession and bankruptcy petition occurred on the same date, it was "crucial to determine the time of the repossession"); *In re Donato*, 17 B.R. 708, 709 (Bankr. E.D. Va. 1982) (bank setoff was not affected by the automatic stay because it occurred three hours before the debtor filed a petition).

Importantly, the Debtor did not dispute the case law illustrating that it is appropriate to analyze fractions of a day in the bankruptcy context. In their motion for stay relief, Landlords cited the cases above, which focus on the precise time of day the debtor filed the bankruptcy petition. R. 116. In its response brief, the Debtor did not cite any case law to the contrary or otherwise ask the Bankruptcy Court to refrain from fractionalizing the date of the petition. R. 362-80.

Here, as in other cases analyzing the events that occurred the same day as the bankruptcy petition, the ends of justice required the Bankruptcy Court to determine the precise time of day that Landlords gave notice of termination. Because Landlords sent those notices of termination by email hours before the Debtor's bankruptcy petition, the Leases cannot be assumed under 11 U.S.C. § 365.

### F.    The Bankruptcy Court erred to the extent it applied equitable principles to its interpretation of the Leases.

In its bench ruling at the April 23 hearing, the Bankruptcy Court found that the equities favored the Debtor. In some cases, the Bankruptcy Court's consideration of equitable principles appeared to influence its interpretation of the Leases. *See* R. 1439-40 ("Also, when you look at 15.2.1, it recognizes that the Landlords' rights [under the Leases] will be determined by law or in equity.");[8] R. 1442 ("To determine

---

[8] The Leases do not say that Landlords' rights under § 15.2.1 "will be determined by law or in equity." *See* R. 1439-40. That section gives Landlords the right to terminate the Leases following an Event of Default and, if the Debtor fails to immediately surrender possession, re-enter and take possession of the Premises. The preceding paragraph recognizes that this remedy, and all the other remedies provided in § 15.2, are "not exclusive" and "are cumulative in addition aro any remedies now or later allowed by law, in equity, or otherwise." R. 158, 227 (Leases § 15.2). Section 15.2.1 itself, however, says nothing about equitable principles determining the right to terminate. Thus, to the extent the Bankruptcy

that this lease could have been terminated on these terms by a mere email is a harsh result."); R. 1443-44 ("Termination on these terms, given the Debtors' reasonable interpretation of the lease, and the policy considerations [underlying] the automatic stay, would be inequitable.").

Although the application of 11 U.S.C. § 362 and whether to lift the automatic stay involves consideration of equitable factors, the narrow question presented here—whether the Leases were terminated pre-petition—is a purely legal issue based on principles of contract interpretation. *See Bourbon Saloon*, 647 F. App'x at 346. Indeed, Landlords argued that the automatic stay did not apply at all because the Leases were not property of the estate. R. 111-12. And to the extent the automatic stay applied, the only "cause" Landlords cited as a basis for relief from the stay was the fact that the Leases were terminated and thus could not be assumed. R. 117-18. Thus presented, the threshold and dispositive issues before the Bankruptcy Court were purely legal.

The fact that Landlords terminated the Leases just before the Debtor sought relief under the Bankruptcy Code does not transform an

---

Court found that Landlords' right to terminate the Leases under § 15.2.1 is governed by equitable principles, that was not an accurate interpretation of the Leases.

otherwise legal analysis into an equitable one. When a lease is terminated before the debtor commences the bankruptcy case, the debtor's interest in the property cannot be revived—not even under the Bankruptcy Court's equitable authority. *In re Tate*, No. 21-50947-rbk, 2021 WL 4467604, at *3 (Bankr. W.D. Tex. Sept. 29, 2021) ("[I]f a lease is validly terminated prior to the commencement of a bankruptcy case, the lease 'is not resurrected by the filing of the petition in bankruptcy, and cannot therefore be included among the debtor's assets.'") (quoting *In re Triangle Labs., Inc.*, 663 F.2d 463, 467-68 (3d Cir. 1981)); *In re Lakes Region Donuts, LLC*, No. BR 13-11823-BAH, 2014 WL 1281507, at *5 (Bankr. D.N.H. Mar. 27, 2014) (the bankruptcy court cannot use its equitable powers to revive a lease terminated before the petition, even if the debtor is capable of curing its default).

To the extent the Bankruptcy Court's equitable considerations were determinative of its decision regarding Lease interpretation and validity of termination, the ruling should be reversed.

## II. The Debtor did not have an interest in the Leases constituting property of the bankruptcy estate because the Leases were terminated pre-petition.

A nonresidential leasehold interest that has "terminated at the expiration of the stated term of such lease before the commencement of the [bankruptcy] case" is not property of the estate. 11 U.S.C. § 541(b)(2). The Bankruptcy Court concluded that § 541(b)(2) applies only to temporal expirations—where the scheduled end date of lease has already passed prior to the bankruptcy petition. In other words, the Bankruptcy Court held that § 541(b)(2) does not apply—and thus a nonresidential lease would still be property of the estate—even though the landlord terminated the lease based on the tenant's default before the debtor filed a bankruptcy petition. R. 1433-35.

Although § 541(b)(2) speaks in terms of leases that terminated by or at "expiration of the stated term," many courts agree with the view that leases the landlord terminated due to the tenant's default or otherwise at the landlord's option before filing of the bankruptcy petition are excluded from property of the estate. *See, e.g.*, *In re Chase Monarch Int'l Inc.*, 581 B.R. 715, 718-23 (Bankr. D. Puerto Rico 2018); *In re Southcoast Exp., Inc.*, 337 B.R. 739, 742-43 (Bankr. D. Mass. 2006); *In re*

*Foote*, 277 B.R. at 396-98; *Policy Realty*, 242 B.R. at 127-28; *Lakes Region Donuts*, 2014 WL 1281507, at *4-9.

This approach makes sense. If the landlord validly terminates a lease based on the debtor's default prior to the bankruptcy petition, under state law governing the lease, the debtor no longer has a legal interest in the lease. The landlord, having validly terminated the lease in compliance with the contractual language and applicable state law, should not be required to undergo the delay and expense of vindicating their rights in bankruptcy court. *See Policy Realty*, 242 B.R. at 128 (legislative history supports the conclusion that landlords of nonresidential real property "are entitled to significant safeguards" and should be entitled to "proceed promptly in ***state court*** to reclaim possession . . . and finalize landlord/tenant disputes") (emphasis added); *Trang*, 58 B.R. at 187-88 ("[T]he 'bankruptcy court cannot create an interest for the debtor where none exists.'") (quoting *In re Anne Cara Oil Co.*, 32 B.R. 643, 647 (Bankr. D. Mass. 1983)).

The Bankruptcy Court adopted a position neither party took—that § 541(b)(2) "is limited to leases where the stated term has expired, not to leases terminated for other reasons." R. 1434. In their stay relief motion,

Landlords cited the case law referenced above and argued that § 541(b)(2) applies and the Leases are not property of the estate because Landlords terminated them before the bankruptcy petition. R. 112. The Debtor did not cite any case law to the contrary or otherwise argue that § 541(b)(2) does not apply to leases that are terminated based on a pre-petition default. R. 362-80.

In addition to being inconsistent with the parties' arguments, the view the Bankruptcy Court followed could lead to unintended results. If the "expiration of the stated term" does not include leases terminated pre-petition by the landlord based on the debtor's default, then tenant-debtors could use a bankruptcy petition to revive leases that were validly terminated long before the date of the petition. *See Robinson,* 54 F.3d at 319-20 (rejecting a rule that would "allow bankrupt tenants whose lease had clearly been abrogated and who had perhaps already been evicted to have a continuing interest in the lease simply because its stated term had not yet expired"); *Schokbeton Indus., Inc. v. Schokbeton Products Corp.,* 466 F.2d 171, 176 (5th Cir. 1972) ("[A] contractual termination provision is unaffected by the filing of a petition in bankruptcy and may be enforced against the trustee or debtor in possession."); *Tate,* 2021 WL 4467604, at

*3 ("[I]f a lease is validly terminated prior to the commencement of a bankruptcy case, the lease 'is not resurrected by the filing of the petition in bankruptcy, and cannot therefore be included among the debtor's assets.'") (quoting *Triangle Labs.,* 663 F.2d at 467-68).

Thus, to the extent the Bankruptcy Court found that the Debtor has an interest in the Leases constituting property of the estate because the stated end date for the Leases had not yet passed at the time of the bankruptcy petition, this Court should reverse that ruling.

## <u>CONCLUSION</u>

For the foregoing reasons, Appellants respectfully request that this Court reverse the Bankruptcy Court's Stay Relief Order and Lease Assumption Order and remand with instructions to enter an order concluding that: the Leases were terminated prior to the time the Debtor filed its chapter 11 petition; the Leases are not property of the bankruptcy estate; and the Leases cannot be assumed pursuant to 11 U.S.C. § 365.

Date: August 14, 2025.

*/s/ Meagan Martin Powers*
Meagan Martin Powers
State Bar No. 24050997
**Martin Powers & Counsel, PLLC**
1431 Greenway Drive, Suite 950
Irving, Texas 75038
Telephone: (214) 612-6474
Direct Line: (214) 612-6471
Facsimile: (214) 247-1155
meagan@martinpowers.com

and

Andrew W.J. Tarr
Patrick H. Hill (*pro hac vice*)
**Robinson, Bradshaw & Hinson, P.A.**
600 South Tryon Street, Suite 2300
Charlotte, NC 28202
Telephone: (714) 377-2536
atarr@robinsonbradshaw.com
phill@robinsonbradshaw.com

**COUNSEL TO APPELLANTS
BVLY PARTNERS CLTZ TYVOLA,
LLC AND BVLY PARTNERS CLTZ
WILKINSON, LLC**

## CERTIFICATE OF COMPLIANCE

I hereby certify that this document complies with the type-volume limit of Fed. R. Bankr. P. 8015(a)(7)(B) because, excluding the parts of the document exempted by Fed. R. Bankr. P. 8015(g), this document contains 11,152 words.

I further certify that this document complies with the typeface requirements of Fed. R. Bankr. P. 8015(a)(5) and the type-style requirements of Fed. R. Bankr. P. 8015(a)(6) because this document has been prepared in a proportionally spaced typeface using Microsoft Word in 14-point Century Schoolbook.

*/s/ Meagan Martin Powers*
Meagan Martin Powers

## <u>CERTIFICATE OF SERVICE</u>

I hereby certify that on August 14, 2025, a true and correct copy of the above and foregoing document was served electronically upon all counsel of record through electronic service.

*/s/ Meagan Martin Powers*
Meagan Martin Powers